UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

JON MCKINNEY,                               )
                                            )
        *Plaintiff*,                        )
                                            )
        *vs.*                               )          2:19-cv-00413-JMS-DLP
                                            )
VIGO COUNTY SHERIFF'S DEPARTMENT,           )
SCOTT BROWN,                                )
JERRAD PIRTLE,[1]                           )
RYAN HARTLEROAD, and                        )
CHRIS HAWKINS,                              )
                                            )
        *Defendants*.                       )

**ORDER**

    Plaintiff Jon McKinney brought this lawsuit against the Vigo County Sheriff's Department

("VCSD"), and VCSD Sheriff's Deputies Scott Brown, Jerrad Pirtle, Ryan Hartleroad, and Chris

Hawkins (collectively, the "Individual Defendants"). [Filing No. 27.] Specifically, Mr. McKinney

asserts claims based on excessive force, assault, battery, false arrest, false imprisonment, and

intentional infliction of emotional distress. [Filing No. 27; Filing No. 37.] Defendants have filed

a Motion for Summary Judgment, [Filing No. 57], which is now ripe for the Court's consideration.

**I.**
**STANDARD OF REVIEW FOR SUMMARY JUDGMENT**

    A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether

a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted

---

[1] Based on the parties' filings, Deputy Pirtle's first name is spelled "Jerrad."  The Court **DIRECTS** the Clerk to correct the spelling of Deputy Pirtle's name to "Jerrad" on the docket.

1

fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the summary judgment standard detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.  Mr. McKinney's Prior Interactions with Deputy Brown

#### 1.  *2011 Traffic Stop*

Sometime in 2011, Mr. McKinney was driving his truck on Highway 41 near Terre Haute, Indiana during a winter storm.  [Filing No. 57-1 at 17.]  Deputy Brown pulled Mr. McKinney over, got out of his police car, and began to scream and yell that when Mr. McKinney had passed Deputy Brown's car, Mr. McKinney shook the deputy's vehicle.  [Filing No. 57-1 at 18.]  Mr. McKinney explained to Deputy Brown that in a 40-mile per hour blizzard, when Mr. McKinney's truck cut the wind, it probably shook Deputy Brown's car.  [Filing No. 57-1 at 18.]  Mr. McKinney told Deputy Brown to give him a ticket and they could take it to court if Deputy Brown felt that Mr. McKinney had done something wrong, [Filing No. 57-1 at 18-19], but Deputy Brown did not issue a citation or a warning to Mr. McKinney,  [Filing No. 57-1 at 18].

#### 2.  *2016 Theft*

In December 2016, Mr. McKinney had three four-wheelers and a trailer stolen from his driveway.  [Filing No. 57-1 at 13-14.]  In August 2017, Mr. McKinney found one of the stolen four-wheelers parked behind a house and called the police.  [Filing No. 57-1 at 14.]  Deputy Brown was the first officer to arrive, and when Mr. McKinney approached him, Deputy Brown said "Shut up.  I'll be doing the talking here."  [Filing No. 57-1 at 15.]  When other deputies arrived on the scene shortly after, Deputy Brown left.  [Filing No. 57-1 at 16.]

### B.  Events on April 12, 2018

#### 1.  *Mr. McKinney Believes Someone is Outside of His House*

On April 12, 2018 around 4:00 a.m., Mr. McKinney was awakened by his dogs barking, which caused him to believe that someone was outside his house.  [Filing No. 57-1 at 12.]  Mr. McKinney went outside and saw a car driving slowly north.  [Filing No. 57-1 at 12.]  Because of

the recent theft of his four-wheelers, Mr. McKinney believed that someone might be trying to steal from him again, so he ran back inside, put on clothes, grabbed two weapons, and went back outside. [Filing No. 57-1 at 12-13.]  When he was outside, he saw the same car driving slowly and headed south, back toward his house.  [Filing No. 57-1 at 13.]  Mr. McKinney saw the car pull behind a bank outside of his field of view.  [Filing No. 57-1 at 13.]  As Mr. McKinney walked toward his car in his driveway, he heard the other car's door close and saw the car drive away on Hunt Road. [Filing No. 57-1 at 13; Filing No. 57-1 at 21.]

After he saw the car drive away, Mr. McKinney got into his wife's vehicle and drove in the same direction on Hunt Road that the other car had driven.  [Filing No. 57-1 at 23.]  Mr. McKinney was not sure whether anything had been stolen but wanted to get the license plate of the car in case something had been stolen.  [Filing No. 57-1 at 23.]  Mr. McKinney drove approximately three-quarters of a mile on Hunt Road though he was not able to locate the other car.  [Filing No. 57-1 at 23-24.]  However, he noticed a VCSD vehicle parked in a well-lit gravel parking lot with the headlights off.  [Filing No. 57-1 at 23-25.]

### 2.  Events in the Gravel Parking Lot

Mr. McKinney pulled into the parking lot, drove to the VCSD car, and pulled the driver's side of his car next to the driver's side of the VCSD car.  [Filing no. 57-1 at 24.]  Mr. McKinney asked the officer—who turned out to be Deputy Brown—whether there had been any traffic in the area.  [Filing No. 57-1 at 25.]  Mr. McKinney believed he had awakened Deputy Brown because Deputy Brown did not respond to his question but instead said, "Well, who the hell are you?" [Filing No. 57-1 at 25.]  Mr. McKinney responded by asking the officer's name, and Deputy Brown responded "I am Lieutenant Scott Brown" in a "very agitated and offensive" tone.  [Filing No. 57-1 at 25-26.]  Mr. McKinney responded that he knew who Deputy Brown was, and said, "You don't

really want to help anyone, and I don't need your help.  We're being burglarized -- we were being burglarized, but I don't want you at my house.  I will call the state police." [Filing No. 57-1 at 26.] Mr. McKinney then told Deputy Brown that he was going home to check on his family, and he turned around to drive back home.  [Filing No. 57-1 at 26.]

### 3.  Mr. McKinney Drives Home

As Mr. McKinney was turning around to drive home, Deputy Brown turned on his headlights, and began to walk toward Mr. McKinney.  [Filing No. 57-1 at 28.]  Mr. McKinney observed that Deputy Brown was "very angry and out of control," and Mr. McKinney put his hand up before Deputy Brown reached his window and said "Scotty, we're not gonna go there." [Filing No. 57-1 at 28-30.]  Mr. McKinney believed that Deputy Brown had a reputation for using excessive force and for being a bully, and he assumed that Deputy Brown was going to hurt him. [Filing No. 57-1 at 28.]  Mr. McKinney then drove toward the exit of the parking lot.

Mr. McKinney was in a hurry to get back home to check on his family.  [Filing No. 57-1 at 35-36.]  The exit to the parking lot entered onto Hunt Road, very close to the four-way stop intersection of Hunt Road and Maple Avenue.  [Filing No. 57-1 at 36.]  Mr. McKinney turned left out of the parking lot onto Hunt Road and proceeded to the four-way stop.  [Filing No. 57-1 at 36.] Though he slowed down to look both ways, Mr. McKinney did not come to a complete stop as he went through the intersection.  [Filing No. 57-1 at 37.]

Mr. McKinney proceeded to drive home, and he called the state police as he drove home to report the burglary.  [Filing No. 57-1 at 37-39.]  At some point during the call, he also told the state police that Deputy Brown was coming to his house "to do harm." [Filing No. 57-1 at 37-39.] As Mr. McKinney braked to turn into his driveway, he "noticed in the far distance that there was a set of red lights and couldn't see the car, just noticed there were red lights flashing up in the

skyline." [Filing No. 57-1 at 37-38].  Mr. McKinney believed the lights were on Deputy Brown's car and thought that Deputy Brown was coming to his house, but he did not know "[w]hether it was to check out a burglary or to continue to pursue [him] in anger, . . . But [he] did fear for [his] life." [Filing No. 57-1 at 38-39.]  Mr. McKinney pulled into his driveway and stayed in his car while he was on the phone with the state police.  [Filing No. 57-1 at 39.]

When Mr. McKinney saw Deputy Brown's car getting closer, he went inside and remained on the phone with the state police.  [Filing No. 57-1 at 40.]  The state police officer told Mr. McKinney that the officer was speaking with Deputy Brown and advised Mr. McKinney that it would be best if Mr. McKinney went back outside and talked to Deputy Brown.  [Filing No. 57-1 at 40.]  Deputies Pirtle and Hartleroad arrived shortly before Mr. McKinney went back outside. [Filing No. 66-7 at 8.]

### 4.  *Mr. McKinney's Interactions with Deputy Brown at His Home*

Mr. McKinney remained on the phone with the state police while he went back outside. [Filing No. 57-1 at 40.]  Mr. McKinney walked down a walkway and approached Deputy Brown, and when he reached the end of the walkway, he told Deputy Brown that he was on the phone with the state police.  [Filing No. 57-1 at 41; Filing No. 57-1 at 47.]  Deputy Brown walked up to him, said "You son of a bitch," and hit Mr. McKinney with a closed right fist on the left side of Mr. McKinney's face.  [Filing No. 57-1 at 41.]  The blow knocked Mr. McKinney's phone from his hand, but it did not knock Mr. McKinney down.  [Filing No. 57-1 at 41.]  Deputy Brown then told Mr. McKinney that he was under arrest.  [Filing No. 57-1 at 47-48.]  Mr. McKinney asked why he was being arrested, and Deputy Brown swung again.  [Filing No. 57-1 at 41.]  Although Mr. McKinney was able to avoid Deputy Brown's fist, Deputy Brown's "ring or something caught the side of [Mr. McKinney's] right cheek and left a big cut."  [Filing No. 57-1 at 41; Filing No. 57-1

at 49.]  In addition, Deputy Brown's momentum caused him to fall to the ground.  [Filing No. 57-1 at 51.]

### 5.  *After Mr. McKinney is Struck*

After Deputy Brown's ring cut Mr. McKinney, Deputy Jerrad Pirtle approached Mr. McKinney and tased him.  [Filing No. 57-1 at 49-50; Filing No. 57-3 at 17.]  At the same time, Deputy Pirtle told Mr. McKinney that he was tasing him, and instructed Mr. McKinney to stop resisting.  [Filing No. 57-1 at 49-50.]  Mr. McKinney asked Deputy Pirtle what Deputy Pirtle would like him to do, and Deputy Pirtle told Mr. McKinney to sit down.  [Filing No. 57-1 at 50.] While Mr. McKinney was in the process of sitting down, Deputy Pirtle and Deputy Hartleroad dove on top of him and "slammed" him onto his back and began to handcuff him.  [Filing No. 57-1 at 50-51; Filing No. 66-6 at 3-4.]  Deputy Hawkins arrived on the scene around that time and observed that Mr. McKinney was not resisting.  [Filing No. 66-6 at 3-5.]

Deputies Pirtle and Hartleroad put handcuffs on Mr. McKinney's left wrist first.  [Filing No. 57-1 at 51-53; Filing No. 66-7 at 12.]  When Deputy Pirtle grabbed Mr. McKinney's right wrist, Mr. McKinney told Deputy Pirtle that he had undergone "very successful rotator cuff surgery a number of years ago, but you can't jerk that arm behind me and shove it up my back to my neck." [Filing No. 57-1 at 42; Filing No. 57-1 at 51.]  While Deputy Pirtle was in the process of placing the cuffs on Mr. McKinney's right wrist, Deputy Brown had gotten back on his feet and "bootstomped" Mr. McKinney on his right side while he was on the ground.  [Filing No. 57-1 at 53.]  Deputies Pirtle and Hartleroad then jerked Mr. McKinney's right arm back, and Deputy Pirtle said, "This is just a normal range of motion."  [Filing No. 57-1 at 51-52.]  Mr. McKinney believed that the force from Deputies Pirtle and Hartleroad jerking his arm pulled the shoulder head "outside

[his] shoulder under the delts and then severed all three rotator cuff attachments, front, top, and back severed."  [Filing No. 57-1 at 51-52.]

At that point, Mr. McKinney was in "some of the wors[t] pain [he had] ever had in [his] life," to the point that he was crying and in shock.  [Filing No. 57-1 at 43; Filing No. 57-1 at 57.] Mr. McKinney was complaining of the pain the entire time, and his wife was also yelling to the deputies that Mr. McKinney had undergone rotator cuff surgery.  [Filing No. 57-1 at 42; Filing No. 57-1 at 57.]

After he was handcuffed, the deputies put Mr. McKinney into a police car and took him to jail, bypassing the hospital on the way.  [Filing No. 57-1 at 43; Filing No. 57-1 at 55.]

### 6.  Mr. McKinney is Taken to Jail

Mr. McKinney first received any sort of medical attention when he arrived at the jail. [Filing No. 57-1 at 59.]  His injuries were so severe that when the nurse at the jail saw his shoulder, she said, "I can't touch that" and told the deputies, "You have to take him to the hospital."  [Filing No. 57-1 at 59.]

At the hospital, the doctor diagnosed Mr. McKinney with a "complete rupture of the right rotator cuff, breaking the ball and socket.  A piece of the socket was broke[n] off at the bottom as the ball was ripped out of socket."  [Filing No. 57-1 at 60.]  Mr. McKinney underwent rotator cuff surgery approximately 40 days after the incident.  [Filing No. 57-1 at 60.]

### C.  VCSD's Review of the Incident

After the incident, Detective White, a VCSD detective, conducted an internal investigation of the incident and interviewed all of the deputies that were involved, Mr. McKinney, and Mr. McKinney's wife.  [Filing No. 66-4 at 12.]  Detective White "concluded in his report that there was no wrongdoing found on the Vigo County sheriff's deputies' part that could be concluded from

the statements that [Detective White] got or the reports from Mr. McKinney and his wife." [Filing No. 66-4 at 13; Filing No. 57-8 at 5.]  However, VCSD did admit in a Rule 30(b)(6) deposition that assuming Mr. McKinney's version of events was true, the use of force was not reasonable. [Filing No. 66-4 at 20.]  VCSD also acknowledged that if Mr. McKinney's version of events was true, all of the Individual Defendants were under a duty to report the incident to VCSD supervisors. [Filing No. 66-4 at 20.]

### D.  This Lawsuit

Mr. McKinney brought this lawsuit against Defendants on August 27, 2019.  [Filing No. 1.]  In his Amended Complaint, the operative complaint in this case, Mr. McKinney sets forth claims against Deputies Brown, Pirtle, Hartleroad, and Hawkins under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment, [Filing No. 27 at 7], as well as state law claims for assault, battery, false arrest, false imprisonment, and intentional infliction of emotional distress, [Filing No. 27 at 10].  In addition, he sets forth a *Monell* claim against VCSD based on the Individual Defendants' use of excessive force, as well as state law claims against VCSD for assault, battery, false arrest, false imprisonment, and intentional infliction of emotional distress. [Filing No. 27 at 9-10.]

On November 10, 2020, Defendants filed a Motion for Summary Judgment, [Filing No. 37], which is now ripe for the Court's decision.

### III.
#### DISCUSSION

### A.  Claims against the Individual Defendants

#### *1.  Mr. McKinney's § 1983 Excessive Force Claims*

In support of their Motion, Defendants argue that they are entitled to qualified immunity because "Defendants acted reasonably based on McKinney's actions and the circumstances

surrounding his arrest." [Filing No. 58 at 13.]  They argue that it was the middle of the night, that Mr. McKinney disregarded a stop sign and then fled, that Mr. McKinney went into his home instead of waiting for Deputy Brown, and that Deputy Brown decided to arrest Mr. McKinney only after Mr. McKinney came out of his home.  [Filing No. 58 at 13.] Defendants argue that even if a reasonable person could find that their conduct was unreasonable, they are still entitled to qualified immunity "because [Mr.] McKinney cannot demonstrate precedent that has placed this constitutional question beyond debate." [Filing No. 58 at 14.]  Defendants also argue that Deputies Brown, Hartleroad, and Pirtle did not use excessive force.  [Filing No. 58 at 6.]  They argue that Mr. McKinney was upset and "in an emotional state" when he spoke to Deputy Brown, knowingly disregarded a stop sign, continued driving when he was pursued by Deputy Brown, backed away from the Individual Defendants when he was told that he was under arrest, and continued to resist after being tased.  [Filing No. 58 at 7-8.]  Defendants emphasize that "[i]t was after 4 a.m.," that they did not know whether Mr. McKinney was armed, and that they did not know whether anyone else was inside Mr. McKinney's home.  [Filing No. 58 at 9.]  Accordingly, Defendants argue, "[g]iven court[s'] deference to law enforcement officers, no jury could reasonably find the Defendants used excessive force arresting [Mr.] McKinney." [Filing No. 58 at 8.]

Mr. McKinney responds that the Individual Defendants are not entitled to qualified immunity "because the disputed material facts demonstrate that any reasonable officer would have realized [Mr.] McKinney's rights were being violated by the excessive force employed." [Filing No. 65 at 22.]  He argues that in light of "VCSD's admi[ssion] in its 30(b)(6) deposition that if [Mr.] McKinney is believed, the force used by the deputies was unreasonable," there exist material issues of fact that preclude "summary judgment as to excessive force and qualified immunity." [Filing No. 65 at 22 (citing Filing No. 66-4 at 19-20 ("**Q:** . . . I'm just saying to assume that [what

Mr. McKinney said in his interview] was true, would the use of force have been reasonable?  **A:** No.")).]  Mr. McKinney contends that in addition to being unreasonable, each use of force against Mr. McKinney—Deputy Brown striking Mr. McKinney twice with a closed fist; Deputy Pirtle tasing and violently forcing Mr. McKinney to the ground; Deputies Brown and Hartleroad violently handcuffing Mr. McKinney and tearing his rotator cuff in the process; and Deputy Brown kicking Mr. McKinney—was so plainly excessive that, as an objective matter, any reasonable deputy would have known that it was a constitutional violation.  [Filing No. 65 at 24-26.]

Defendants reply that Mr. McKinney posed a threat to the Individual Defendants and resisted arrest.  [Filing No. 74 at 3.]  They argue that the Individual Defendants did not know whether Mr. McKinney or someone else inside his home was armed, nor did they "know how he would react" when he walked outside after failing to stop when pursued by Deputy Brown.  [Filing No. 74 at 3.]  They argue that Deputy Brown told Mr. McKinney that he was under arrest, but that instead of complying, Mr. McKinney pulled back and would not allow Deputies Hartleroad or Pirtle to place his hands behind his back.  [Filing No. 74 at 3-4.]  Defendants contend that Mr. McKinney fails to establish that the Individual Defendants' "use of force was unreasonable under the circumstances."  [Filing No. 74 at 4.]  Defendants also argue that the "constitutional right at stake was not clearly established at the time of the defendant[s'] alleged violation."  [Filing No. 74 at 4-5.]  They argue that Mr. McKinney does not identify any existing precedent that places the relevant constitutional question beyond debate and that he fails to show that the Individual Defendants should have known the arrest was illegal.  [Filing No. 74 at 5.]

Qualified immunity shields officers from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017) (quoting *Pearson v.*

*Callahan*, 555 U.S. 223, 231 (2009)). While qualified immunity is an affirmative defense, the plaintiff carries the burden of defeating a defendant's claim of qualified immunity. *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003). "Whether a government official is entitled to qualified immunity is a legal question for resolution by the court, not a jury." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).

When examining a qualified immunity claim, the court considers two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Id.* at 621. "A right is clearly established if it is sufficiently clear that any reasonable official would understand that his or her actions violate that right, meaning that existing precedent must have placed the statutory or constitutional question beyond debate." *Zimmerman v. Doran*, 807 F.3d 178, 183 (7th Cir. 2015).

"[W]hile the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force employed in a particular situation may not have been clear to a reasonable officer at the scene." *Becker v. Elfreich*, 821 F.3d 920, 928 (7th Cir. 2016) (quoting *Bush v. Strain,* 513 F.3d 492, 502 (5th Cir. 2008)).   At the time of Mr. McKinney's arrest, "'it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects.'  Further, it was clearly established that only minimal force is warranted where the accused is passively resisting." *Id.* at 928-29 (quoting *Abbott v. Sangamon Cty.*, 705 F.3d 706, 732 (7th Cir. 2013)).

As stated above, pursuant to the summary judgment standard, the Court must "consider all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw all reasonable inferences from that evidence in favor of the party opposing summary judgment."

*Feliberty v. Kemper Corp.*, 98 F.3d 274, 276–77 (7th Cir. 1996).  This standard applies during the Court's review of qualified immunity claims, and Defendants have wholly disregarded it. The evidence viewed in the light most favorable to Mr. McKinney could lead a reasonable jury to conclude that the deputies—particularly Deputy Brown and Deputy Pirtle—used excessive force. Not only is that possibility clear from the evidence, but VCSD expressly admitted it was true. [Filing No. 66-4 at 20.]  A reasonable jury could conclude that Mr. McKinney was not resisting (or at most passively resisting) when Deputy Brown arrived at Mr. McKinney's house.  Despite that, Deputy Brown punched Mr. McKinney in the face twice and "bootstomped" him.  In addition, Deputy Pirtle tased Mr. McKinney, and, while handcuffing Mr. McKinney, used enough force to cause severe injuries to Mr. McKinney's shoulder.

A jury could reasonably find that Mr. McKinney was a non-resisting or passively resisting suspect and that the force used by Defendants was excessive.  Further, because it was clearly established at the time of the incident that no more than minimal force was permissible to arrest a non-resisting or passively resisting suspect, the individual Defendants are not entitled to qualified immunity.  *See Becker*, 821 F.3d at 929.  Accordingly, Defendants Motion is **DENIED** as to Mr. McKinney's excessive force claims.

> 2. *Mr. McKinney's State Law Assault, Battery, and Intentional Infliction of Emotional Distress Claims*

Defendants argue that Mr. McKinney's assault, battery, and emotional distress claims are barred by the Indiana Tort Claims Act (the "ITCA").  [Filing No. 58 at 14.]  Defendants contend that Deputies Brown, Pirtle, Hartleroad, and Hawkins were enforcing the law and acting within the scope of their employment when Deputy Brown pursued Mr. McKinney when the other deputies arrested Mr. McKinney.  [Filing No. 58 at 15.]

Mr. McKinney responds that the Individual Defendants are not immune under the ITCA because "there is no immunity if 'the officer use[d] unnecessary or excessive force.'" [Filing No. 65 at 32 (quoting *Wilson v. Isaacs*, 929 N.E.2d 200, 203-04 (Ind. 2010)) (alteration in original).] Mr. McKinney asserts that "[t]here exists a material question of fact as to the intentional tort of assault and battery and intentional infliction of emotional distress." [Filing No. 65 at 33.]

Defendants reply that the ITCA bars Mr. McKinney's assault, battery, and emotional distress claims because the Individual Defendants were enforcing a law when they arrested Mr. McKinney. [Filing No. 74 at 8.]

Defendants argue that Mr. McKinney's state law tort claims for assault, battery, and intentional infliction of emotional distress are barred by the ITCA law enforcement immunity provision. [Filing No. 58 at 14 (citing Ind. Code § 34-13-3-3(8)(A)).] The law enforcement immunity provision of the ITCA provides that a "governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . [t]he adoption and enforcement of or failure to adopt or enforce . . . a law . . . unless the act of enforcement constitutes false arrest or false imprisonment." Ind. Code § 34-13-3-3(8)(A). In determining whether this provision immunizes a police officer's conduct, a court must determine whether: (1) the officer was acting within the scope of his employment when the injury to plaintiff occurred; and (2) whether the officer was engaged in the enforcement of a law at that time. *Snyder v. Smith*, 7 F. Supp. 3d 842, 874 (S.D. Ind. 2014) (citing *Harness v. Schmitt*, 924 N.E.2d 162, 165 (Ind. Ct. App. 2010)).

The Indiana Supreme Court has recognized, however, that police conduct that breaches an independent statutory duty is not immunized by the law enforcement provision of the ITCA. *Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010) (discussing *Patrick v. Miresso*, 848 N.E.2d

1083 (Ind. 2006)).  For example, because Ind. Code § 35-41-3-3(b)(1) limits police officers to using only force that is reasonable, an officer's conduct will not be shielded from liability if he uses excessive or unreasonable force.  *Wilson*, 929 N.E.2d at 203-04 ("[T]he statutory provision [concerning the reasonable use of force] restrains the statutory immunity from erecting a shield to liability for conduct contrary to the [use of force] statute.").  Defendants wholly disregard this legal authority.

To determine whether a claim is barred by law enforcement immunity, courts must look to the conduct forming the foundation of the claim, rather than relying on the legal theory upon which the claim is based. *See Bowens v. City of Indianapolis*, 2014 WL 4680662, at *7 (S.D. Ind. Sept. 19, 2014) ("[I]mmunities afforded governmental defendants focus not on legal theories but on conduct.  The court must therefore focus on whether the alleged conduct is immunized under the law enforcement immunity provision at Ind. Code § 34-13-3-3(8), not whether the immunity applies to a particular legal theory." (emphasis in original)).  If conduct constituting excessive force is the foundation of the tort claim, the claim is not barred by the law enforcement immunity provision.  *See id.* ("Because the alleged excessive force is the foundation of [plaintiff's] emotional distress claims and because excessive force is not immunized conduct, the court rejects the City's argument that it is immunized by the [ITCA] against the claims for negligent and intentional infliction of emotional distress."); *Todero v. Blackwell*, 383 F. Supp. 3d 826, 842 (S.D. Ind. 2019) ("Similarly here, [plaintiff] alleges that in using excessive force, [the officers] intentionally inflicted emotional distress, so section 34-13-3-3(8) immunity does not apply.").

The conduct forming the foundation of Mr. McKinney's claims is the excessive force used by the Individual Defendants, and, again, the facts viewed in the light most favorable to Mr. McKinney would demonstrate that his claims are therefore not barred by the law enforcement

immunity provision of the ITCA.  Defendants' Motion is **DENIED** as to Mr. McKinney's state law claims for assault, battery, and intentional infliction of emotional distress.

### 3. *State Law False Imprisonment and False Arrest Claims*

Defendants argue that Mr. McKinney's false imprisonment and false arrest claims fail because they had probable cause to arrest him.  [Filing No. 58 at 15.]  They maintain that Mr. McKinney "was not arrested for disregarding a stop sign.  [Mr.] McKinney was arrested for resisting law enforcement." [Filing No. 58 at 7.]  Defendants argue that they had probable cause to arrest Mr. McKinney for that offense because he disregarded a stop sign and did not stop when pursued by Deputy Brown.  [Filing No. 58 at 15-16.]

Mr. McKinney responds that the Individual Defendants did not have probable cause to arrest him.  [Filing No. 65 at 33.]  In support of his argument, Mr. McKinney notes that his expert witness, Captain Anthony Gregory, opined that the deputies lacked probable cause to arrest Mr. McKinney, [Filing No. 65 at 33 (citing Filing No. 66-9 at 16 ("[W]hen you actually examine the facts leading up to this moment, arguably there is nothing to indicate that there was any probable cause to arrest Mr. McKinney in the first place."))], and that "Deputy Hartleroad testified that there was no intention to arrest [Mr.] McKinney when the deputies arrived at his house," [Filing No. 65 at 33 (citing Filing No. 66-7)].

Defendants reply by reiterating that they had probable cause to arrest Mr. McKinney and "[i]t is immaterial that the Defendants did not intend to arrest Mr. McKinney when they arrived at his home." [Filing No. 74 at 8-9.]

"A false arrest requires absence of probable cause."[2] *Row v. Holt,* 864 N.E.2d 1011, 1016 (Ind. 2007) (citing *Earles v. Perkins,* 788 N.E.2d 1260, 1265 (Ind. Ct. App. 2003)). "The probable cause determination turns on 'whether a reasonable person, under the facts and circumstances encountered by the arresting officer, would believe that the suspect had committed or was committing a criminal offense.'" *Id.* at 1017 (quoting *Earles,* 788 N.E.2d at 1265). "This standard is an objective one and '[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'" *Id.* (quoting *Whren v. United States,* 517 U.S. 806, 813 (1996)). The question of probable cause is typically "a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis,* 998 F.2d 431, 434 (7th Cir. 1993).

Defendants maintain that Mr. McKinney was arrested for resisting law enforcement. [Filing No. 58 at 7.] Under Indiana Code Section 35-44.1-3-1(a)(3), a person who knowingly or intentionally "flees from a law enforcement officer after the officer has, by visible or audible means, including operation of the law enforcement officer's siren or emergency lights, identified himself or herself and ordered the person to stop" commits the offense of resisting law enforcement. As they did with earlier arguments, Defendants assert the facts as they purport them to exist, and not in the light most favorable to Mr. McKinney as required when seeking summary judgment.

---

[2] "False imprisonment consists of an unlawful restraint on one's freedom of movement against his will." *Delk v. Bd. of Com'rs of Delaware Cty.*, 503 N.E.2d 436, 439 (Ind. Ct. App. 1987). However, "where a claim for false imprisonment stems from an alleged false arrest, 'we need not make a separate analysis for the former.'" *Tallman v. State,* 13 N.E.3d 854, 857 (Ind. Ct. App. 2014) (quoting *Row v. Holt,* 864 N.E.2d 1011, 1016 (Ind. 2007)). Accordingly, the Court will only discuss Mr. McKinney's false arrest claim.

Here, the facts viewed in the light most favorable to Mr. McKinney demonstrate that an issue of fact remains as to whether Defendants had probable cause to arrest Mr. McKinney for resisting law enforcement.  It is unclear how far Deputy Brown was from Mr. McKinney when he activated his siren or lights and began to pursue Mr. McKinney, and the parties appear to agree that Mr. McKinney had already entered his home by the time Deputy Brown reached his driveway, [Filing No. 57-1 at 39; Filing No. 57-2 at 27], which he did so only after speaking with the state police for some time while sitting in his driveway, [Filing No. 57-1 at 39].  In addition, a reasonable jury could conclude that Deputy Brown could not have reasonably believed that Mr. McKinney fled.  Mr. McKinney did not notice Deputy Brown's lights until he was already pulling into his driveway.  [Filing No. 57-1 at 37-38.]  At that time, Mr. McKinney did not drive away, but rather parked his car, went inside his house, and then shortly thereafter came back outside to meet the deputies.  [Filing No. 57-1 at 37-39.]  In sum, the facts viewed in the light most favorable to Mr. McKinney reveal the existence of issues of fact as to whether Deputy Brown and the other deputies had probable cause to arrest Mr. McKinney for resisting law enforcement, and a reasonable jury could find that they did not have probable cause.  Accordingly, Defendants' Motion for Summary Judgment is **DENIED** as to Mr. McKinney's claims for false arrest and false imprisonment.

### B.  Claims Against VCSD

Defendants argue that Mr. McKinney's § 1983 claim against VCSD fails for two reasons: "(1) [VCSD] has not violated § 1983 because the Defendants used reasonable force in arresting [Mr.] McKinney; and (2) even if the Defendants used excessive force, [Mr.] McKinney has failed to establish in any meaningful way that [VCSD] failed to properly train, supervise, and discipline its employees in a widespread policy or practice and its inaction was the moving force of [Mr.] McKinney's alleged constitutional violation."  [Filing No. 58 at 10.]  Defendants argue that there

is no evidence of repeated instances involving excessive force by any of the Individual Defendants, and Mr. McKinney's Amended Complaint does not reference any other incidents which might demonstrate that VCSD has a widespread policy of deliberate indifference to excessive force or other misconduct.  [Filing No. 58 at 11.]

Mr. McKinney argues in response that this case falls within the scope of "single-incident liability," and therefore does not require proof of a pattern of similar violations to show deliberate indifference.  [Filing No. 65 at 29 (citing *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011)).]  Mr. McKinney argues that because the internal investigation found that none of the Individual Defendants had violated VCSD's policies, VCSD in effect "found it acceptable that deputies could resort to physical force when an individual was not resisting, and the individual was not informed that they were under arrest."  [Filing No. 65 at 30.]  With respect to Deputy Hawkins in particular, Mr. McKinney argues that Deputy Hawkins was required to report his observation of Deputy Brown's use of force but did not, and that his failure "implies that there exists a patently obvious failure to train deputies with regard to excessive force at VCSD."  [Filing No. 65 at 30-31.]  In sum, Mr. McKinney argues that the Court "should deny summary judgment for [VCSD], even without establishment of a pre-existing pattern, based on the patently objective evidence of a failure to train in this incident."  [Filing No. 65 at 31.]

Defendants reply that "single-incident liability is very narrowly tailored and is to be applied only in extreme circumstances not present in this situation."  [Filing No. 74 at 7.]  They argue that VCSD "has no policy or widespread pattern involving excessive use of force and single-incident liability does not apply to this cause of action."  [Filing No. 74 at 7.]

Given that the Court has already found that genuine disputes of fact preclude summary judgment in favor of Defendants on Mr. McKinney's excessive force claim, the Court will not

19

address the first argument raised by VCSD. Instead, it turns to VCSD's second argument concerning a failure of proof as to Mr. McKinney's *Monell* claim. The basis of Mr. McKinney's *Monell* claim was originally not a model of clarity. [*See* Filing No. 37 ("Plaintiff will also prove that Defendant Vigo County Sheriff's Department failed to properly train, direct, and supervise the individual defendant deputies, failed to investigation allegations of their excessive force, and failed to properly discipline the individual deputies. Plaintiff will prove a policy or pattern of condoned misconduct.").][3] But Mr. McKinney has somewhat synthesized his claim in his response to VCSD's summary judgment motion, and he now asserts that his case falls within the "single-incident liability" theory of recovery.

The Supreme Court has held that a failure to act amounts to municipal action for *Monell* purposes only if the defendant has notice that its training, or lack thereof, will cause constitutional violations. *J.K.J. v. Polk Cty.*, 960 F.3d 367, 379 (7th Cir. 2020). "Demonstrating that notice is essential to an ultimate finding and requires a 'known or obvious' risk that constitutional violations will occur." *Id.* at 379-80 (citing *Bd. of Cty. Com'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). In many *Monell* cases, notice requires proof of a prior pattern of similar constitutional violations. *Id.* at 380. An "alternative path to *Monell* liability comes from a door the Supreme Court opened in *City of Canton v. Harris*, 489 U.S. 378 (1989). The Court observed that there may . . . be circumstances in which 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights' that a factfinder could find deliberate indifference to the need for training." *J.K.J.*, 960 F.3d at 380 (quoting *City of Canton,*

---

[3] To the extent Mr. McKinney sought to assert a standalone claim for either Deputy Hawkins' failure to report or for an improper investigation, such claims would fail. Neither Deputy Hawkins' failure to report the incident nor Detective White's investigation caused a constitutional violation or other injuries. *See J.K.J.*, 960 F.3d at 380.

489 U.S. at 390).  "In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton*, 489 U.S. at 390.  "Put another way, a risk of constitutional violations can be so high and the need for training so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation." *J.K.J.*, 960 F.3d at 380.

As noted, Mr. McKinney's response to VCSD's motion limits his § 1983 claim against VCSD to this alternative path:  that the need for more or different training was so obvious and the inadequacy of the current training was so likely to cause a constitutional violation that a factfinder could find deliberate indifference to the need for training.  To prevail on such a theory, Mr. McKinney must show both that VCSD failed to train its deputies (or provided inadequate training), and that VCSD was on notice that a constitutional violation was a highly predictable consequence of that lack of training.  *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2004).

Mr. McKinney offers no evidence whatsoever of a failure to train on the part of VCSD. He cites no evidence as to VCSD's training program or policies at all, but instead takes two leaps: first, he asserts that the outcome of the internal affairs investigation in favor of VCSD establishes inadequate training, and second he claims that Deputy Hawkins' failure to report the force alleged by Mr. McKinney must result from inadequate training.  In essence, he argues that if VCSD considers the individual deputies' conduct here reasonable, then it must have an inadequate training program.

"Summary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010).  Although the Court must draw all reasonable inferences

21

in Mr. McKinney's favor as the nonmoving party, he must still put forth evidence such that a reasonable jury could find in his favor.  *Id.* ("The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there must be evidence on which the jury could reasonably find in favor of the nonmoving party.").  Mr. McKinney has had the opportunity to depose each of the deputies involved, as well as VCSD, yet he produces no evidence as to a wholly inadequate or non-existent training program, policy, or practice.  The only evidence to which he cites in support of his position is that Deputy Hawkins' failure to report the incident to VCSD implies a lack of training and that the VCSD investigation results essentially deemed the use of physical force on a non-resisting individual as acceptable.  [Filing No. 65 at 30.]  Without evidence as to the actual training received or lack thereof, however, neither argument can prevail.

As for Deputy Hawkins' failure to report, Mr. McKinney cites no evidence linking Deputy Hawkins' inaction to an absence of training, and "[m]ere speculation is insufficient to defeat a motion for summary judgment." *In re Cohen*, 507 F.3d 610, 613 (7th Cir. 2007) (citing *Chicago Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 464 F.3d 651, 659 n.4 (7th Cir. 2006)).  Likewise, the VCSD investigation and Detective White's findings do not demonstrate that a lack of training caused the constitutional violations.  That Detective White ultimately found no wrongdoing by the deputies is not evidence that the deputies' training on use of force was lacking or inadequate.  It is evident that Detective White credited the version of events given by the VCSD deputies, in which they claim Mr. McKinney was resisting arrest.  Unlike this Court on review of a motion for summary judgment, VCSD is not required to afford all reasonable inferences in favor of Mr. McKinney.

Finally, further undermining Mr. McKinney's position is evidence in the record that VCSD deputies did receive training.  Mr. McKinney asked VCSD what training its deputies receive "with regards to the use of force [and] escalation of force with regard to dealing with suspects, detainees," during VCSD's 30(b)(6) deposition.  [Filing No. 66-4 at 15.]  VCSD responded:

> Well, our deputies obviously go to the Indiana Law Enforcement Academy for whatever it is now, 15, 16 weeks.  They receive physical tactics training there.  That is probably where they get their foundation.
>
> And then when they come back to their individual department, we do in-house training.  Our academy standard that the state requires is two hours a year of physical tactics training, and that can include hands-on training, it can include classroom training, it can include like you had mentioned de-escalation, it can include handcuffing, you know, the list goes on and on, but all of those things are addressed throughout the year.  We do – our deputies have to complete that two hours throughout the year.

[Filing No. 66-4 at 15-16.]  In addition, Deputy Brown testified about training courses in which he had participated.  [*See* Filing No. 57-2 at 60-61.]

In sum, Mr. McKinney fails to produce evidence that VCSD was on notice that its training was so lacking that a constitutional violation was a "highly predictable consequence of [its] failure to act."  *Woodward*, 368 F.3d at 929.  Because Mr. McKinney has failed to produce the necessary evidence, his *Monell* claim cannot survive summary judgment, and Defendants' Motion is **GRANTED** as to Mr. McKinney's *Monell* claim against VCSD.[4]

---

[4] Defendants did not offer any independent argument with respect to Mr. McKinney's state law claims against VCSD.  Therefore, to the extent their Motion sought summary judgment as to those claims, Defendants' Motion is **DENIED**.

### C.  28 U.S.C. § 1927

Under 28 U.S.C. § 1927, where an attorney "so multiplies the proceedings in any case unreasonably and vexatiously," the Court may require that attorney "to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred."

This case is a quintessential "he said-he said" case, and even Defendants recognize that the Court must review "the record in the light most favorable to the non-moving party."  [Filing No. 58 at 5.]  The facts viewed in the light most favorable to Mr. McKinney clearly show that a reasonable jury could conclude that the Individual Defendants—and Deputies Brown and Pirtle in particular—used excessive force against Mr. McKinney and arrested him without probable cause, in violation of both federal and state law.  And if the genuine dispute wasn't clear enough from the facts themselves, *VCSD expressly admitted that if Mr. McKinney's version is true, the force used was not reasonable.*  [*See* Filing No. 66-4 at 19-20.]

Defendants' arguments that their use of force was reasonable and arrest lawful are simply a request for the Court to completely ignore the standard of review and take their word for it, apparently because the Court should give "deference to law enforcement officers."  [Filing No. 58 at 8.]  Such an argument is wholly inappropriate and indeed contrary to law.  It serves only to vexatiously and unreasonably multiply the proceedings in this case, not only because Defendants' arguments required the parties and Court to expend time and resources litigating the issue, but also because if the Court were to grant Defendants' request, the Court would undoubtedly—and rightly—be reversed on appeal.  This approach to summary judgment is both costly and wasteful. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014).

Accordingly, the Court **ORDERS** Defendants' counsel to show cause as to why these "shenanigans" should not be declared excessive under 28 U.S.C. § 1927, *Malin*, 762 F.3d at 564.,

and why it should not be ordered to pay Mr. McKinney's costs, expenses, and attorney's fees incurred in responding to Defendants' arguments raised in their summary judgment motion, other than their *Monell* argument.  Defendants' counsel shall respond to this order by **April 20, 2021**.

## IV.
### CONCLUSION

Consistent with the foregoing, Defendants' Motion for Summary Judgment, [57], is **GRANTED IN PART** and **DENIED IN PART** as follows:

- The Motion is **GRANTED** as to Mr. McKinney's § 1983 claim(s) against VCSD; and

- The Motion is **DENIED** as to Mr. McKinney's claims against the Individual Defendants and Mr. McKinney's state law claims against VCSD.

In addition, Defendants' counsel shall have through **April 20, 2021** to **SHOW CAUSE** as to why the Court should not order it to pay Mr. McKinney's costs and fees incurred in responding to Defendants' arguments other than the argument on Mr. McKinney's *Monell* claim.

Finally, the Court **DIRECTS** the Clerk to correct the spelling of Deputy Pirtle's name to "Jerrad" on the docket.

Date: 4/6/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution via ECF only to all counsel of record